UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

NORTHERN ELECTRIC, INC.,

        Plaintiff,

v.                                                    Case No. 05-C-499

LOCAL UNION 158, INTERNATIONAL
BROTHERHOOD OF ELECTRICAL
WORKERS,

        Defendant.

**DECISION AND ORDER**

In this action for declaratory relief, Plaintiff Northern Electric, Inc. ("Northern Electric"), seeks a determination that it has no duty to arbitrate unresolved bargaining issues with Defendant Local Union 158, International Brotherhood of Electrical Workers ("Local 158" or "the Union"). The Union has filed a motion to dismiss or, in the alternative, to stay the case and compel arbitration on ground that the issue of whether Northern Electric has a duty to arbitrate is itself subject to arbitration. For the reasons stated herein, the Union's alternative motion will be granted and the parties ordered to arbitration.

**I. FACTS**

Plaintiff, Northern Electric is an electrical contractor specializing in commercial construction projects. Local 158 is a labor organization representing electrical workers in an industry affecting commerce. (Compl. ¶¶ 1-2.) Both are parties to a collective bargaining agreement (CBA), the most recent terms of which began on June 1, 2002 and were due to expire

on May 31, 2005. The CBA provides that its terms continue pending resolution of the negotiations for a new agreement. CBA § 1.02 (C).

The CBA was negotiated on Northern Electric's behalf by the Northeastern Division of the Wisconsin Chapter of the National Electical Contractors Association (NECA), a multi-employer organization that negotiates and administers labor agreements on behalf of its members. Between 2002 and 2004, Northern Electric discovered a growing disparity between the wages and benefits it was required to pay under the CBA and those paid by its local non-union competitors. As a result of this disparity, Northern Electric's successful bid ratios had dramatically declined over those years, as did the number of its employees and the hours they worked. Northern Electric complained to NECA about the problem and asked what it could do about it. Dissatisfied with NECA's response, Northern Electric notified NECA that it was terminating NECA's right to represent Northern Electric in negotiations with Local 158 for a new CBA.

In February, 2005, Northern Electric and Local 158 met to begin negotiations for a new contract. Northern Electric informed the Union that it wanted to disassociate itself completely from NECA. (Conard Aff. ¶ 8.) Northern Electric proposed a one-year "market recovery" agreement, which included a wage freeze and conversion of the Union-NECA retirement plan to a 401K pension plan. The combination of these and other changes were needed, Northern Electric argued, in order to bring its wage/benefit package and other provisions in line with non-union contractors so that it could competitively bid against such contractors and increase work hours for its union employees. (Conard Aff. ¶ 9.)

The Union rejected Northern Electric's proposal and instead proposed a $3 wage/benefit increase. Over the course of negotiations, the Union advised Northern Electric that if the parties

2

were unable to agree, it intended to seek "interest arbitration" before the Council on Industrial Relations (CIR) pursuant to the existing CBA.

The term "interest arbitration" is apparently intended to refer to arbitration of disputes over proposed changes to the CBA. The existing CBA provided for binding arbitration of disputes over renewal terms at the request of either party. Section 1.02(D) states:

> Unresolved issues or disputes arising out of the failure to negotiate a renewal or modification of this agreement that remain on the 20th of the month preceding the next regular meeting of the Council on Industrial Relations may be submitted jointly or unilaterally to the Council for adjudication. Such unresolved issues or disputes shall be submitted no later than the next regular meeting of the Council following the expiration date of this agreement or any subsequent anniversary date. The Council's decisions shall be final and binding.

(CBA § 1.02(D).) It was on the basis of this provision that the Union claimed it was entitled to submit the unresolved bargaining issues to binding arbitration.

However, the existing CBA also contained a "most favored nations" clause, which entitled Northern Electric to the benefit of any more favorable agreement the Union entered into with another contractor over the term of the agreement. Section 5.02 states:

> The Union agrees that if, during the life of this Agreement, it grants to any other Employer in the Electrical Contracting Industry on work covered by this Agreement, any better terms or conditions than those set forth in the Agreement such better terms or conditions shall be made available to the Employer under this Agreement and the Union shall immediately notify the Employer of such concession.

(CBA § 5.02 .)

During the course of negotiations, Northern Electric had requested and obtained copies of contracts the Union had entered into with three other contractors that were no longer represented by NECA. (Conard Aff. ¶ 12, Exs. 4, 5, and 6.) Each of these contracts provided for mandatory arbitration of disputes over renewal terms only upon mutual agreement of the parties. *See* § 1.02(E)

3

of Exs. 4, 5, and 6. Claiming that a provision requiring binding arbitration only upon mutual consent of the parties is a more favorable term than one requiring binding arbitration upon the unilateral request of one party, Northern Electric took the position with the Union that it was not required to submit to binding arbitration on the unresolved renewal terms. (Compl. ¶ 11.) When the Union disagreed and proceeded to submit the matter to arbitration, Northern Electric filed this action. (Compl. ¶ 13.)

## II. DISCUSSION

This case arises under Section 301(a) of the Labor Management Relations Act (LMRA), 29 U.S.C. § 185, which confers federal jurisdiction in suits over collective bargaining agreements. Its disposition is governed by the principles announced by the Supreme Court in the series of cases known as the Steelworker Trilogy: *Steelworkers v. American Mfg. Co.*, 363 U.S. 564 (1960); *Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574 (1960); and *Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593 (1960). Those principles, as recounted by the Court in *AT&T Technologies v. Communications Workers*, 475 U.S. 643 (1986), are as follows: First, "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed to submit." *Id.* at 648 (*quoting Warrior & Gulf*, 363 U.S. at 582). Second, "the question of arbitrability – whether a collective bargaining agreement creates a duty for the parties to arbitrate the particular grievance – is undeniably an issue for judicial determination." 475 U.S. at 649. Third, "in deciding whether the parties have agreed to submit a particular grievance to arbitration, a court is not to rule on the potential merits of the underlying claims." *Id.* And fourth, "where a contract contains an arbitration clause, there is a presumption of arbitrability in the sense that '[a]n order to arbitrate the particular grievance should not be denied unless it may be said

4

with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.'" 475 U.S. at 650 (*quoting Warrior & Gulf*, 363 U.S. at 582-83.) In other words, "[d]oubts should be resolved in favor of coverage." *Id.*

In this case, the dispute is over the application of a specific provision of the CBA. Northern Electric contends that by virtue of the "most favored nations" clause contained in the CBA, it is free to elect the provisions of the contracts the Union entered into with the non-NECA contractors which require mutual consent for binding arbitration of disputed renewal terms. Since Northern Electric does not consent to arbitration of renewal terms, it contends it has no duty to arbitrate. The Union, on the other hand, denies that the provisions of the other agreements are more favorable and contends that Northern Electric is bound by the terms of the CBA, which clearly mandate arbitration upon the request of either party. The dispute between the parties, then, is over the application of the "most favored nations" clause, and the issue before me is whether the parties agreed to arbitrate such a dispute. I conclude that they did.

The language of the CBA relating to grievances is extremely broad. Section 2.01 states that "[t]here shall be no stoppage of work either by strike or lockout because of any proposed changes in this Agreement or dispute over matters relating to this Agreement. All such matters shall be handled as stated herein." Under Section 2.03, "[a]ll grievances or questions in dispute shall be adjusted by the duly authorized representatives of each of the parties to this Agreement. In the event that these two (2) are unable to adjust any matter within forty-eight (48) hours, they shall refer the same to the local Labor-Management Committee." All matters coming before the Labor-Management Committee are decided by majority vote. (CBA § 2.04.) In the event the Labor-

5

Management Committee fails to agree or to adjust any matter, it is then referred to the CIR. The decision of the CIR is "final and binding on both parties." (CBA § 2.05.)

The Seventh Circuit has held that when an arbitration clause is broad in scope, as this clause is, the presumption of arbitrability can be overcome in only two very limited sets of circumstances: (1) where the agreement itself expressly excludes the dispute; or (2) where there exists " the most forceful evidence of a purpose to exclude the claim from arbitration." *Local 232, Allied Industrial Workers v. Briggs & Stratton Corp.*, 837 F.2d 782, 786 (7th Cir.1988) (*quoting Warrior & Gulf*, 363 U.S. at 585). Here, it is clear that neither exception applies. There is no exception to the grievance procedure excluding this type of dispute, and Northern Electric has offered no evidence of a purpose to exclude such a claim from arbitration. I therefore conclude that the dispute over the application of the "most favored nations" clause is subject to arbitration.

Northern Electric also argues, however, that it should not be compelled to submit its dispute with the Union to arbitration pursuant to the provisions of the CBA because the CIR has an inherent conflict of interest and will not fairly decide the case. The CIR is a labor/management organization that provides a forum for the resolution of labor disputes in the electrical contracting industry. Disputes submitted to the CIR are decided by panels comprised of individuals selected by the Union and NECA. Union members, Northern Electric contends, cannot be expected to side with it, since the Union's interests are adverse. This would be true in any dispute. But what is unusual in this case, Northern Electric contends, is that the NECA members are also disposed to rule against it. Northern Electric contends that NECA members are unlikely to side with it in its dispute with the Union since "favoring Northern Electric would weaken [the] Association and encourage other NECA members to separate themselves from NECA." (Compl. ¶ 8.)

6

Northern Electric's argument is not without merit. The existing CBA provides for employer contributions to a joint Union/NECA administered apprenticeship training program (CBA § 9.16), pension and welfare funds (CBA §§ 10.02, 10.05), National Employee Benefit Fund (CBA § 7.01), Labor Management Cooperation Committee Fund (CBA § 10.07), and Contract Administration Fund (CBA § 10.08). Northern Electric's decision to disassociate itself from NECA and negotiate its own agreement with the Union may have a direct impact on contributions to these funds. Northern Electric claims that it had already noted a change in NECA's attitude toward it even before it began negotiations with the Union. According to Northern Electric's president, "NECA was no longer cooperative in providing information or responding to my calls, and it was clear that NECA now considered Northern Electric to be a competitor of its members and it treated it as such." (Conard Aff. ¶ 6.) Furthermore, Northern Electric notes, none of the three agreements between the Union and non-NECA contractors name the CIR as arbitrator. Two of the other agreements name the Wisconsin Employment Relations Commission (WERC) as arbitrator and the third names the American Arbitration Association (AAA). (Conard Aff. Exs. 4, 5, and 6, § 2.05.) Northern Electric contends that under the "most favored nations" clause, it is entitled to select either the AAA or WERC as the arbitrator of its dispute with the Union. (Pl.'s Brief in Opp. at 13.)

Whether Northern Electric is entitled to have either the AAA or WERC serve as arbitrator under § 5.02 of the CBA, however, is likewise a decision for the arbitrator named in the CBA. It depends on whether the designation of either the AAA or WERC as arbitrator is a better term or condition than those contained in the CBA. The disagreement between the parties on this issue, like the dispute over mandatory arbitration of disputed terms of contract renewal, is "a dispute over matters relating to this Agreement," (CBA § 2.01), and for the reasons already noted, I conclude that

7

the parties agreed to submit such disputes to arbitration. But this does not mean that Northern Electric is without any remedy if, as it contends, the RIC has a clear conflict of interest.

As the Union itself observes, the Seventh Circuit has ruled that the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.*, is generally applicable to disputes involving labor contracts. Def.'s Br. In Supp. at 5, *citing Pryner v. Tractor Supply Co.*, 109 F.3d 354, 357 (7th Cir. 1997). The Federal Arbitration Act authorizes district courts to vacate an award "[w]here there was evident partiality or corruption in the arbitrators, or either of them." 9 U.S.C. § 10(a)(2). Read literally, this section would seem to require proof of actual bias on the part of a majority of the members of an arbitration panel in order for the court to vacate the award. Noting that actual bias is almost impossible to demonstrate, however, the Seventh Circuit has suggested that a clear conflict of interest may be sufficient to justify relief under § 10(a)(2) of the act. *Merit Ins. Co. v. Leatherby Ins. Co.*, 714 F.2d 673, 681 (7th Cir. 1983) ("If circumstances are such that a man of average probity might reasonably be suspected of partiality, maybe the language of section 10(b) [now 10(a)(2)] can be stretched to require disqualification."). *See also Tamari v. Bache Halsey Stuart Inc.*, 619 F.2d 1196, 1200 (7th Cir. 1980) ("principle [authorizing court to vacate award] applies whether actual bias or merely an appearance of bias is charged"). In order to warrant such relief, however, "[t]he interest or bias of an arbitrator must be direct, definite, and capable of demonstration rather than remote, uncertain, or speculative." *United States Wrestling Federation v. Wrestling Division of the AAU, Inc.*, 605 F.2d 313, 318 (7th Cir. 1979) (*quoting Lucke v. Spiegel*, 266 N.E.2d 504, 508 (Ill. App. 1970).

From the foregoing, it follows that if, as Northern Electric asserts, the CIR has a direct and definite conflict of interest and Northern Electric so moves, the CIR should disqualify itself from serving as arbitrator of the dispute between Northern Electric and the Union. If it fails to do so, it

risks having any decision it renders vacated under 9 U.S.C. § 10(a)(2). That issue also, however, should first be addressed by the arbitrator. "The judiciary should minimize its role in arbitration as judge of the arbitrator's impartiality. That role is best consigned to the parties, who are the architects of their own arbitration process, and are far better informed of the prevailing ethical standards and reputations within their business." *Commonwealth Coatings Corp. v. Continental Casualty Co.*, 393 U.S. 145, 151 (1968) (White, J. concurring). *See also Petition of Dover S. S. Co.*, 143 F. Supp. 738, 742 (S.D. N.Y. 1956) ("Under the Federal Arbitration Act, the Court's power to deal with bias is limited to setting aside the award after it has been rendered."). *See generally* W. J. Dunn, Annotation, *Disqualification Of Arbitrator By Court Or Stay Of Arbitration Proceedings Prior To Award, On Grounds Of Interest, Bias, Prejudice, Collusion, Or Fraud Of Arbitrators*, 65 A.L.R.2d 755 (1959-2004).

Accordingly, and for the reasons set forth above, I conclude that the dispute between the parties is referable to arbitration under the CBA. Although the Union has moved to dismiss the action, I conclude that its alternative motion for a stay of this action pending completion of arbitration pursuant to 9 U.S.C. § 3 is more appropriate under the circumstances. The court will administratively close this case for statistical purposes but retain jurisdiction to address any further issues that may arise upon completion of arbitration.

**SO ORDERED.**

Dated this   6th   day of July, 2005.

s/ William C. Griesbach
William C. Griesbach
United States District Judge

9

Case 1:05-cv-00499-WCG   Filed 07/06/05   Page 9 of 9   Document 14